## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JEFFERY HARPER**                                    **CIVIL ACTION**

**VERSUS**                                                **No. 24-1101**

**W&T OFFSHORE INC**                                        **SECTION I**

## ORDER AND REASONS

Before the Court is defendant W&T Offshore Inc.'s ("W&T") motion[1] for summary judgment. Plaintiff Jeffery Harper ("Harper") filed a response[2] in opposition. W&T filed a reply.[3] For the reasons that follow, the Court grants W&T's motion.

### I.    FACTUAL BACKGROUND

This case arises out of an incident, in which Harper claims that he was injured when he tripped and fell on a valve handle that was protruding into a passageway while working on the platform East Cameron 321-A ("EC 321-A").[4] At the time of the alleged incident, Harper was working as a production operator on EC 321-A.[5] This platform is located on the Outer Continental Shelf off the coast of Louisiana and is owned by W&T.[6] Harper was employed by Danos LLC ("Danos")[7] at the time and was

---

[1] R. Doc. No. 28.
[2] R. Doc. No. 29.
[3] R. Doc. No. 30.
[4] R. Doc. No. 1, ¶¶ VII–IX.
[5] R. Doc. No. 28-2, at 1; R. Doc. No. 29-1, at 2.
[6] R. Doc. No. 28-2, at 1; R. Doc. No. 29-1, at 2.
[7] Harper was originally employed by Wood Group when he began working on EC 321-A in 2022. R. Doc. No. 28-3, at 5–6. Danos purchased Wood Group in 2023, and Harper

contracted to W&T through a master service contract.[8] Harper filed suit in this Court on April 30, 2024, alleging that W&T was negligent and that this negligence caused Harper's injuries.[9]

W&T now seeks summary judgment on the ground that Harper was W&T's borrowed employee, making workers' compensation benefits Harper's exclusive remedy and barring the suit against W&T pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(a).[10] W&T likewise argues that summary judgment is appropriate because "the valve handle which allegedly caused his injury was an open and obvious condition."[11]

Harper argues that summary judgment is inappropriate because there are disputed issues of fact that must be resolved before the Court can determine whether Harper is a borrowed employee.[12] Harper also argues that W&T's open and obvious argument is based on caselaw that has been reversed by the Louisiana Supreme Court.[13] Because the Court concludes that Harper is a borrowed employee, the Court does not reach whether the condition was open and obvious.

---

stayed with Danos through the transition. *Id.* at 5. Harper testified that nothing really changed for him when Danos took over Wood Group. *Id.* at 6. For simplicity, the Court refers to Harper's direct employer as Danos throughout this order and reasons.

[8] R. Doc. No. 29-1, at 6; R. Doc. No. 30-1, at 3.

[9] R. Doc. No. 1, ¶ X.

[10] R. Doc. No. 28-1, at 3.

[11] *Id.* at 1.

[12] R. Doc. No. 29, at 1.

[13] *Id.*

## II. STANDARD OF LAW

Summary judgment is proper when, after reviewing the materials in the record, a court determines that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine dispute is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). If the nonmovant fails to meet its burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255. "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *JW Dev., LLC v. Indep. Specialty Ins. Co.*, No. CV 22-390, 2022 WL 3139133, at *1 (E.D. La. Aug. 5, 2022) (Africk, J.) (quoting *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017)).

## III.    ANALYSIS

Section 1333(b) of the Outer Continental Shelf Lands Act incorporates and extends the benefits of the LHWCA to employees injured on fixed platforms on the Outer Continental Shelf. 43 U.S.C. § 1333(b). The LHWCA entitles employees to worker's compensation benefits as their exclusive remedy against their employer "because the Act bars all common law tort actions against the employer." *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1243 (5th Cir. 1988) (citing 33 U.S.C. § 905(a)). Borrowed employees and borrowing employers enjoy the same rights to workers' compensation and protection from tort liability afforded by the LHWCA. *See id.*

The parties agree that Harper's alleged injury occurred on the Outer Continental Shelf.[14] Thus, if Harper is found to be W&T's borrowed employee, he is covered by the LHWCA, entitling him to workers' compensation pursuant to the Act and barring him from suing W&T in tort.

"The issue of borrowed employee status is a matter of law for the district court to determine, but some cases involve factual disputes on the issue of borrowed employee status and require findings by a fact-finder." *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 677 (5th Cir. 1993) (per curiam). "The party asserting the existence of a borrowed employee relationship bears the burden of proof." *Butcher v. Superior Offshore Int'l, LLC*, 754 F. Supp. 2d 829, 836 (E.D. La. 2010) (Vance, J.) (citing *Franks v. Assoc'd Air Center, Inc.*, 663 F.2d 583, 587 (5th Cir.1981)). In order to determine borrowed employee status, courts consider nine factors:

> (1) Who had control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> (2) Whose work was being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?

*Id.* at 676 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969)).

In some cases, "[t]he first factor, the question of who has control over the employee and the work he is performing, has been considered the central issue of

---

[14] R. Doc. No. 28-2, at 1; R. Doc. No. 29-1, at 2.

'borrowed employee' status." *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244–45 (5th Cir. 1988). However, "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship." *Ruiz*, 413 F.2d at 312. The Fifth Circuit has stated that "certain of these factors may be more important than others" in different cases, depending on the facts before the court. *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir. 1985).

### a. Who had control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

Although no single factor or combination of factors is dispositive, the Fifth Circuit "has considered the first factor—control—to be the central factor." *Brown*, 984 F.2d at 677. The first factor requires the Court to distinguish "between authoritative direction and control, and mere suggestion as to details or the necessary cooperation where the work furnished is part of a larger undertaking." *Ruiz*, 413 F.2d at 313 (quotation omitted).

The undisputed facts regarding this factor are as follows. The parties agree that Harper never received any work instructions from Danos while on W&T's platforms.[15] Danos did not have any supervisors present on EC 321-A, nor did Harper maintain any contact with Danos while he was on EC 321-A.[16] Indeed, Harper reported his accident to W&T's person in charge, Rodney Carline ("Carline"), rather than reporting it to Danos.[17] Either Carline or W&T's lead operator, George Gray

---

[15] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 2.
[16] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 3–4.
[17] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 4.

("Gray"), conducted mandatory meetings each morning, and every worker on the platform was required to attend.[18] Gray would also sometimes instruct Harper to work on platforms other than EC 321-A.[19]

Despite these agreed-upon facts, the parties dispute the level of instruction and supervision that Harper received from W&T. W&T argues that Harper received daily work assignments from Carline at the morning meetings and that Harper was directly supervised by W&T.[20] However, Harper argues that he did not receive specific instructions on general production days and that he was not typically told where to work or what to do.[21] Harper argues that he was trained by Danos regarding how to perform his job duties and that he did not require or receive daily instructions.[22] Instead, he states that the purpose of the morning meeting was to give a general overview of everyone's job scope for the day.[23] Harper states that, on regular production days with a 12-hour shift, he would typically only speak to Carline once in the context of instructions regarding the work he was performing.[24]

The disagreement seems to come from somewhat conflicting testimony in Harper's deposition. Harper testified at one point that Carline typically gave him tasks for the day and daily work instructions during mandatory morning meetings.[25]

---

[18] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 2.
[19] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 3.
[20] R. Doc. No. 28-1, at 4–6.
[21] R. Doc. No. 29, at 7.
[22] R. Doc. No. 29-1, at 2.
[23] R. Doc. No. 29, at 7.
[24] *Id.*
[25] R. Doc. No. 28-3, at 8–9.

Yet, at another point he stated that the morning meetings were to let all the workers on the platform know generally what was occurring that day and discuss safety tips, but Carline did not instruct each of the workers where they were to begin their work.[26] Harper testified that Carline did not "stand over his shoulder" giving specific instructions[27] and that he could function without being told what needed to be done.[28] Regarding supervision, he testified that Carline never came around to monitor the work he was performing on regular production days.[29] In contrast, Carline testified that he would give instructions at the meetings regarding what work was to be performed that day[30] and that he directly supervised Danos employees, including Harper.[31]

There are clearly disputed issues of fact regarding the specific degree of control that W&T exercised over Harper. However, even accepting Harper's contention that he did not require or receive daily instructions and that he was not closely supervised, a finding of borrowed employee status is not barred. Indeed, the Fifth Circuit in *Melancon v. Amoco Prod. Co.* concluded that a plaintiff's "specialized skills" and a lack of instructions on how he was to perform his work did not bar a finding of borrowed employee status. *See Melancon*, 834 F.2d at 1245 (citing *Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140 (4th Cir. 1980)); *see also Huff*, 631 F.2d at 1143

---

[26] R. Doc. No. 29-2, at 22–24.
[27] R. Doc. No. 28-3, at 10–11.
[28] *See* R. Doc. No. 29-2, at 3.
[29] R. Doc. No. 29-2, at 21.
[30] R. Doc. No. 28-4, at 14–15.
[31] R. Doc. No. 29-3, at 23–24.

("It is of no moment that [defendant's] supervision of the welders was not close."). Since *Melancon*, district courts have consistently "rejected the argument" that skilled workers who require little supervision cannot be considered borrowed employees. *Robertson v. W & T Offshore, Inc.*, 712 F. Supp. 2d 515, 529 (W.D. La. 2010) (citing cases).

At a minimum, W&T had the authority to tell Harper where to work. W&T likewise exercised some degree of supervision over Harper through the morning meetings, and it acted as Harper's only point of managerial contact while on W&T platforms. In contrast, Danos declined to exercise any control over Harper or supervise Harper in any way. Harper's ability to work independently with minimal instruction does not defeat this point. The Court therefore concludes that this factor favors finding borrowed employee status.

### b. Whose work was being performed?

W&T is in the business of producing oil, and the parties agree that all work performed on its platforms is performed in furtherance of its objectives.[32] This factor weighs in favor of finding borrowed employee status.

### c. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

"In deciding this factor, courts have looked to contractual provisions and the behavior of the parties to determine whether an understanding existed." *LeBlanc v. AEP Elmwood, LLC*, 946 F. Supp. 2d 546, 551 (E.D. La. 2013) (Lemelle, J.) (citing *Brown*, 984 F.2d at 677). In this case, the master service agreement between W&T

---

[32] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 3.

and Danos provides that Danos "is an independent contractor and that neither [Danos] nor [Danos's] principals, partners, employees[,] or subcontractors are servants, agents[,] or employees of W&T."[33]

A contract purporting to prohibit individuals from being considered borrowed employees "does not automatically prevent borrowed employee status." *Brown*, 984 F.2d at 677–78. "The reality at the worksite and the parties' actions in carrying out a contract . . . can impliedly modify, alter, or waive express contract provisions." *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988). "Obviously parties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise." *Id.*

While the contract here purports to prohibit borrowed employee status for Harper, much of the behavior of the parties—including Danos's lack of supervision and control—suggests that the parties may have impliedly modified or altered their agreement. Thus, the master service agreement "could create a factual dispute on the third factor if the other factors were disregarded." *See Billizon v. Conoco, Inc.*, 993 F.2d 104, 106 (5th Cir. 1993). "Previously faced with this issue, [the Fifth Circuit] has concluded that summary judgment is appropriate when the remaining factors clearly point to borrowed-employee status." *Id.* Because there are genuine issues of material fact regarding whether this factor favors borrowed employee status, the Court concludes that this factor goes against borrowed employee status for purposes of this

---

[33] R. Doc. No. 29-4, at 1.

motion. However, this does not bar the Court from granting summary judgment in favor of W&T because all remaining factors clearly point to borrowed employee status.[34]

### d.  Did the employee acquiesce in the new work situation?

The Fifth Circuit has phrased the relevant inquiry as whether "[c]onsidering the length of time that [Harper] worked on [W&T's] platform, we can conclude that he acquiesced to his working conditions." *See Hotard v. Devon Energy Prod. Co.*, 308 F. App'x 739, 742 (5th Cir. 2009) (citing *Brown*, 984 F.2d at 678). In *Brown*, the Fifth Circuit noted that "one month is a sufficient amount of time for [a plaintiff] to appreciate [his or her] new work conditions." *See Brown*, 984 F.2d at 678.

Here, Harper worked on EC 321-A and other W&T platforms for two years prior to February 17, 2024.[35] Harper was well aware of his working conditions and

---

[34] Harper argues that there are disputed issues of material fact with respect to other factors, which preclude summary judgment. R. Doc. No. 29, at 15. Harper cites *Alday v. Patterson Truck Line, Inc.*, in which the Fifth Circuit stated that the presence of a contractual provision prohibiting borrowed employee status raised genuine issues of material fact. *Alday*, 750 F.2d at 378–79. Yet *Alday* is distinguishable because, in that case, the plaintiff had worked for the alleged borrowing employer for only one day. *Id.* at 379. The Fifth Circuit noted the absence facts showing that the other factors favored borrowed employee status. *See id.* at 378–79.

Harper likewise cites *Brown* where the Fifth Circuit reversed the district court's grant of summary judgment based on a finding of borrowed employee status because the parties had a similar contract provision, there where disputed issues of fact regarding who controlled the employee, and the remaining factors did not overwhelmingly favor borrowed employee status. *Brown*, 984 F.2d at 679. This case is likewise distinguishable. While there are disputed issues regarding the first factor of control, the undisputed facts are sufficient to weigh in favor of borrowed employee status, and the remaining factors overwhelmingly support borrowed employee status.

[35] R. Doc. No. 28-2, at 1; R. Doc. No. 29-1, at 2. While the parties agree in their statements of uncontested material facts that Harper worked on W&T platforms for two years prior to his alleged injury, some of Harper's deposition testimony suggests

chose to continue working in them. There is no evidence that Harper complained of his working conditions or otherwise refused to accept them. And Harper does not dispute that this factor weighs in favor of borrowed employee status.[36] The Court therefore concludes that this factor weighs in favor of Harper being a borrowed employee.

### e. Did the original employer terminate his relationship with the employee?

"The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs." *Capps v. N.L. Baroid-NL Industries*, 784 F.2d 615, 618 (5th Cir. 1986). However, this factor "does not require a lending employer to sever completely its relationship with the employee" for there to be a finding of borrowed employee status "because such a requirement would effectively eliminate the borrowed employee doctrine." *Melancon*, 834 F.2d at 1246 (internal quotations omitted).

It is undisputed that "Harper did not maintain contact with Danos while he was on EC 321-A."[37] Accordingly, this factor weighs in favor of borrowed employee status.

### f.  Who furnished tools and place for performance?

W&T provided the place of performance and all transportation to and from jobsites as well as Harper's lodging, food, and transportation while he was on W&T's

---

that he had been working on W&T platforms for four years. *See* R. Doc. No. 28-3, at 3, 7.

[36] R. Doc. No. 29, at 11.

[37] R. Doc. No. 28-2, at 2; R. Doc. No. 29-1, at 4.

platforms.[38] However, Harper argues that there are factual disputes for the trier of fact to determine regarding this factor.[39] Specifically, Harper argues that he provided his own tools for the job and that Danos was the one who provided personal protective equipment ("PPE") that was required to work on the platform, including a hard hat, fire retardant clothing, and steel toed boots.[40] Harper testified that W&T did not provide him with any tools but that W&T provided its own employees with tools.[41] Carline testified that W&T does ordinarily provide tools for both W&T and Danos employees but that Harper opted to use his own tools instead.[42]

In *Melancon*, the lending employer supplied the plaintiff with a welding machine and related equipment; the plaintiff supplied his own safety equipment; and the borrowing employer supplied "certain consumables, the place of performance, transportation to and from the place of work, food, lodging, etc." *Melancon*, 834 F.2d at 1241, 1246. There, the Fifth Circuit agreed with the district court that, on balance, this factor weighed in favor of borrowed employee status. *Id.* at 1246.

The Court accepts Harper's testimony that he supplied his own tools and that W&T did not supply him with tools for the purpose of this motion. However, because of the undisputed fact that Danos supplied Harper with his PPE and that W&T provided the place of performance, lodging, food, and transportation, the Court concludes that this factor favors borrowed employee status in light of *Melancon*.

---

[38] R. Doc. No. 28-2, at 2–3; R. Doc. No. 29-1, at 3–4.
[39] R. Doc. No. 29, at 11–12.
[40] *Id.*
[41] R. Doc. No. 29-2, at 10, 12–13.
[42] R. Doc. No. 28-4, at 15; R. Doc. No. 29-3, at 20–21.

### g. Was the new employment over a considerable length of time?

"In the case where the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true." *Capps*, 784 F.2d at 618. As stated, Harper worked on EC 321-A and other offshore W&T platforms for two years before the date of the alleged accident.[43] And Harper does not dispute that this factor favors finding borrowed employee status.[44] The Court therefore concludes that this factor weighs in favor of Harper being a borrowed employee.

### h. Who had the right to discharge the employee?

"The proper focus under this factor is whether the borrowing employer had the right to terminate the borrowed-employee's services with the borrowing employer." *Tamez v. Anadarko Petroleum Corp.*, No. CV 15-4941, 2017 WL 4351527 (E.D. La. Oct. 2, 2017) (Morgan, J.) (citing *Capps*, 784 F.2d at 618). The alleged borrowing employer need not have the right to terminate the employee's relationship with the lending employer. *See Brown*, 984 F.2d at 679 ("Although Union did not have the right to terminate Brown's employment with Gulf Inland, it had the right to terminate Brown's work relationship with Union. This arrangement is sufficient to support a finding of borrowed servant status.").

The parties agree that W&T had the right to remove Harper from its platforms for any reason.[45] Harper argues that W&T did not have a right to terminate Harper's

---

[43] R. Doc. No. 28-2, at 1; R. Doc. No. 29-1, at 2.
[44] R. Doc. No. 29, at 12.
[45] R. Doc. No. 28-2, at 3; R. Doc. No. 29-1, at 4.

employment with Danos.[46] However, this is not relevant to the Court's inquiry. Because W&T had the right to terminate Harper's employment with W&T, the Court finds that this factor weighs in favor of borrowed employee status.

### i. Who had the obligation to pay the employee?

The relevant inquiry for this factor is who furnished the funds from which the employee was paid. *See Melancon*, 834 F.2d at 1246 (stating that who furnished the funds to pay the employee "is the determinative inquiry for this factor"). Even when the employee is paid by the lending employer, when the employee's pay is "based on time tickets" that are verified by the alleged borrowing employer, that procedure supports borrowed employee status. *See Brown*, 984 F.2d at 679.

Harper received his paycheck from Danos based on time sheets that were approved by W&T. Harper concedes that this factor favors borrowed employee status pursuant to Fifth Circuit case law.[47] The Court finds that the ninth factor favors borrowed employee status.

## IV. CONCLUSION

For the reasons stated above, the undisputed facts are sufficient to conclude that Harper is W&T's borrowed employee. Only the third factor, asking whether there was an agreement between the original and borrowing employers, weighs against borrowed employee status. All remaining factors—control, whose work is being performed, acquiescence, whether the original employer terminated its relationship

---

[46] R. Doc. No. 29, at 12–13.
[47] *Id.* at 13.

with the employee, who provided the tools and place of performance, length of employment, right to discharge, and obligation to pay—weigh in favor of holding that Harper is a borrowed employee. W&T is therefore entitled to summary judgment as a matter of law, and Harper's exclusive remedy against W&T for his alleged injury is workers' compensation benefits pursuant to the LHWCA. Accordingly,

**IT IS ORDERED** that W&T's motion for summary judgment is **GRANTED**. The above-captioned case is **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, December 23, 2024.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**